NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

NATHAN T., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, J.T., *Appellees*.

No. 1 CA-JV 19-0170
FILED 11-14-2019

Appeal from the Juvenile Court in Maricopa County
No. JS519103
The Honorable Jeffrey A. Rueter, Judge

**AFFIRMED**

COUNSEL

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Paul J. McMurdie delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Judge Jennifer M. Perkins joined.

---

**M c M U R D I E**, Judge:

¶1        Nathan T. ("Father") appeals the juvenile court's order terminating his parental relationship with his child, Juliet. For the following reasons, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2        Father and Surisaday H. ("Mother") are the parents of Juliet, born in 2012. Mother also has an older child, Fernando.[1] Mother has an extensive history of alcoholism and aggressive and violent behavior when intoxicated. Mother and Father had an eight-year relationship, and their history is replete with alcohol abuse, domestic violence, and neglect, resulting in three dependencies.

### First Dependency

¶3        Between February and December 2013, the Department of Child Safety ("DCS") received three reports alleging that the parents were abusing alcohol, engaging in domestic violence, and neglecting the children's basic needs. In February 2014, police went to the parents' home because Father appeared intoxicated when he drove Fernando home from school. There, police found blood on the floor, and Mother was in the bathroom, her nose and mouth covered in blood. Mother, however, denied domestic violence had occurred. Mother and Father admitted drinking vodka, and Father was arrested for aggravated driving under the influence. He was eventually placed on three years' probation. After this incident, DCS provided the family with in-home preservation services, but Mother failed to submit to urinalysis testing.

¶4        In March 2014, DCS took custody of the children, filed a dependency petition, and placed them with relatives. The juvenile court

---

[1]        Fernando is not a party to this appeal, but the facts surrounding him are relevant to this case.

found the children dependent and set a case plan of family reunification. The parents participated in services, including substance-abuse testing and treatment, and the court dismissed the dependency in May 2015.

**Second Dependency**

¶5          In November 2015, DCS again took custody of the children because Fernando disclosed that Mother physically abuses him after consuming alcohol. When police arrived at the home, they found Mother intoxicated and unconscious; Father had left her alone with three-year-old Juliet. Although Juliet did not have any injuries, there were indications of abuse and neglect by Mother. Father and Mother admitted to DCS that Mother had relapsed with alcohol and was drinking every day. At that time, Father stated he wanted Mother "out of his home." DCS placed the children with relatives and filed a renewed dependency petition, alleging that Father was unable to provide the children with appropriate parental care, supervision, and protection.

¶6          In April 2016, the juvenile court found the children dependent and set a case plan of family reunification. Father engaged in services, including a rule-out drug test (which returned negative), a psychological evaluation, individual counseling, a parent aide, and parenting classes. Father fully participated in services, but by July 2016, Mother had vacillated in her commitment to substance-abuse testing and group sessions.

¶7          Father completed a psychological evaluation in September 2016 with Dr. James Thal. During the assessment, Father asserted that Mother had been clean and sober since November 2015. He denied knowledge of Mother ever abusing the children, although he acknowledged she was charged with felony child abuse. He likewise claimed that the children had never witnessed domestic violence. Father affirmed his dedication to their relationship, stating that Mother was "making progress." But Father stated that if Mother relapsed again, he planned to obtain an order of protection and leave the relationship.

¶8          Dr. Thal diagnosed Father with alcohol use disorder, in sustained remission by self-report, and a rule-out dependent personality disorder. He concluded that Father exercised extremely poor judgment in leaving the children with Mother and failing to protect them from her alcohol abuse. He opined that Father's future ability to safely parent the children was guarded "due to continuing concerns about his ability to protect" them. Finally, he noted that Father had maintained sobriety but "displayed an attitude which seemed to convey tacit acceptance of his

girlfriend's ongoing alcohol abuse." Dr. Thal recommended that the children not be left alone in Mother's care, and they should not be returned to Father's care if he is living with Mother.

¶9 Despite Dr. Thal's recommendations, Father continued living with Mother. In April 2017, the juvenile court changed the case plan to severance and adoption, and DCS moved to terminate Mother's and Father's parental rights. In August 2017, the parents again claimed that their relationship had ended. By this time, Mother had stopped engaging in reunification services and was not contacting DCS. Accordingly, and because Father had successfully participated in services, DCS withdrew its termination motion and referred Father for a family reunification team in December.

¶10 In February 2018, the juvenile court granted DCS's request to place the children in Father's custody. In May 2018, the court dismissed Juliet's dependency, and in July 2018, dismissed Fernando's dependency after appointing Father as his permanent guardian.

**Third (Current) Dependency**

¶11 In September 2018, DCS received a report that Mother was living in Father's home and had abused Juliet while intoxicated. DCS received conflicting information about whether Mother was living in the home and abusing alcohol and whether the parents were engaging in domestic violence. The DCS investigator reviewed the police report from this incident, which suggested that Mother believed she lived in the home and that Father was not maintaining his sobriety.

¶12 Five days later, police conducted a welfare check in the home. There, they found Mother, who did not appear overly intoxicated. Father still asserted that Mother was not living in the home but admitted she was sleeping there. Upon further investigation, DCS received information that Mother had been living in the home for several months, was often intoxicated, and the couple engaged in domestic violence. DCS took custody of the children and filed a dependency petition.

¶13 Father finally admitted to DCS that Mother had been living in the home, claiming that he "ha[d] been trying to get her out, but she won't leave" and that he did not have time to file an order of protection against her. Two days later, Father obtained an order of protection against Mother. In October 2018, DCS moved to terminate Father's parental rights to Juliet under the neglect and prior-removal grounds. DCS provided Father with services, including a substance-abuse assessment and testing and a parent

aide with visitation. DCS also agreed to refer Father for a psychological evaluation once he demonstrated 30 days' sobriety. During Father's substance-abuse assessment, he admitted that Mother had "relapsed and [had been] watching [the children] while [he] was at work," that Juliet told him Mother had hit her, and that Mother "pulled a knife on him." Father did not submit to drug and alcohol testing.

¶14        In May 2019, the juvenile court held a combined dependency and termination adjudication. After receiving evidence and argument, the juvenile court later issued a ruling terminating Father's parental rights on the grounds alleged. The court also issued an order revoking Father's permanent guardianship of Fernando. Father timely appealed the termination order. We have jurisdiction under the Arizona Constitution Article 6, Section 9 and Arizona Revised Statutes ("A.R.S.") sections 8-235(A), 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

¶15        On appeal, Father argues that insufficient evidence supports the termination grounds. To terminate parental rights, a court must find by clear and convincing evidence that at least one statutory ground articulated in A.R.S. § 8-533(B) has been proven and must find by a preponderance of the evidence that termination is in the best interests of the children. *See Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005); *Michael J. v. ADES*, 196 Ariz. 246, 249, ¶ 12 (2000). Because the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," this court will affirm an order terminating parental rights so long as it is supported by reasonable evidence. *Jordan C. v. ADES*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (quoting *ADES v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004)).

¶16        The juvenile court may terminate parental rights under the neglect ground if DCS proves "[t]hat the parent has neglected . . . a child." A.R.S. § 8-533(B)(2). Neglect is defined as "[t]he inability or unwillingness of a parent, guardian or custodian of a child to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare." A.R.S. § 8-201(25)(a).

¶17        Father argues that the juvenile court's finding that he failed to protect the children should not be affirmed because he did not invite Mother back into the home; Mother promised "things would be different;" forcibly removing Mother from the home after her relapse would have

resulted in her homelessness; and he eventually obtained an order of protection to remove Mother from the home. Father's arguments generally ask this court to reweigh the evidence, which we will not do. *See Castro v. Ballesteros-Suarez*, 222 Ariz. 48, 52, ¶ 11 (App. 2009) (court of appeals "will not reweigh the evidence or substitute [its] evaluation of the facts"). Father also asserts that DCS failed to present evidence refuting his claim that evicting Mother would have resulted in trauma to the children. However, DCS was not required to prove this as an element of the neglect ground. *See* A.R.S. § 8-533(B)(2).

¶18　　　Here, Father had notice of the dangers of leaving Juliet unsupervised in Mother's presence. Juliet had been in and out of foster care since she was one-and-a-half years old—for over five years and three dependencies. Each dependency was founded on substance-abuse, domestic-violence, and neglect concerns, mainly stemming from Father's destructive relationship with Mother. Father was aware of Mother's numerous relapses with alcohol. Even in December 2015, Father recognized that Mother could not sustain sobriety and would eventually decline into "drink[ing] every single day," and would "hide[] water bottles throughout the home that are filled with vodka."

¶19　　　Father also knew that Mother's alcohol abuse placed the children's health and welfare at an unreasonable risk of harm. During the first and second dependencies, the children reported that Mother became physically aggressive towards them after drinking. As early as 2013, Fernando disclosed that Mother would yell, spank, and punch him and that she would yell, scream, and lie on Juliet to get her to stop crying. Mother also told the children that Juliet was ugly and that she hates Juliet. Mother often left the children alone in the home to fend for themselves when she was supposed to be supervising them. When in the home, Mother neglected their basic needs, forcing Fernando to take care of Juliet the best he could. In 2015, Fernando disclosed that Mother had cut him with a knife and choked him. Four months later, Mother held Fernando down on a couch and choked him until Father intervened.

¶20　　　At a minimum, Father knew of Mother's violent tendencies because the parents would often engage in domestic violence when Mother was intoxicated. Although Father minimized Mother's alcohol addiction, Father acknowledged that her behaviors posed a risk to the children's health and wellbeing. Indeed, during the second dependency, Juliet required counseling because she displayed concerning behaviors when agitated, such as banging her head and rocking and humming in patterns.

¶21        Before the court returned the children to Father in February 2018, he participated in counseling, where he discussed how to protect the children from Mother. DCS also required him to demonstrate his ability to keep them safe from Mother through a family reunification team. As Dr. Thal testified, Father "had a path to follow that would have been, in my view successful, and he had a clear understanding of it." To be sure, Father testified he knew that if he did not protect the children from Mother or allowed her to return to the home, it could lead to their removal.

¶22        Despite knowing Mother was a danger to the children and that she was again abusing alcohol, Father allowed her to live in the home for several months and care for the children unsupervised. Furthermore, he actively hid Mother's presence from DCS and instructed the children to lie so she could remain in the home.

¶23        At the termination hearing, Father testified that Mother's alcohol use "started getting bad" until it was "obvious" she was drinking heavily. However, he did not kick Mother out or obtain an order of protection until after DCS took custody of the children because he did not have time and felt sorry for Mother. Ultimately, however, Father made a conscious decision to place the children at significant risk of harm by placing his needs above theirs:

> [DCS Counsel]:      And everyday [sic] in the summer of 2018, you knew you were putting your kids at risk if [Mother] remained [in the home]; you were at risk of them being removed from you?
>
> [Father]:      Yes.  If she wouldn't remain sober, yes.
>
> [DCS Counsel]:      And you made the choice to take that risk despite knowing that?
>
> [Father]:      Yes.

More than reasonable evidence supports the juvenile court's neglect findings.

## CONCLUSION

**¶24**　　　For the foregoing reasons, we affirm the order terminating Father's parental rights to Juliet.



AMY M. WOOD • Clerk of the Court
FILED:　AA