NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

TROY C., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, J.A., *Appellees*.

No. 1 CA-JV 19-0214
FILED 2-13-2020

Appeal from the Superior Court in Maricopa County
No. JD35449
The Honorable Michael D. Gordon, Judge

**AFFIRMED**

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Sandra L. Nahigian
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court,
in which Judge Maria Elena Cruz and Judge David B. Gass joined.

**W I N T H R O P**, Judge:

**¶1**         Troy C. ("Father") appeals the juvenile court's order terminating his parental rights to J.A., born October 3, 2015.  Father argues insufficient evidence supports termination of his parental rights on the abandonment ground under Arizona Revised Statutes ("A.R.S.") section 8-533(B)(1).  Father also argues the juvenile court erred in finding termination of his parental rights would be in J.A.'s best interest.  *See* A.R.S. § 8-533(B).  Because reasonable evidence supports the juvenile court's decision, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2**         Father has had a sporadic relationship with J.A. since the child's birth, and the two have never lived together.  Father met J.A. once when the child was approximately six to nine months old and possibly one other time when J.A. was slightly older.  When J.A. was around two years old, Father began having video calls with J.A. approximately three to four times a month.  At that time, J.A. was living with Amanda A. ("Mother")[1] in Arizona, while Father was living in Iowa.[2]

**¶3**         In February 2018, the Department of Child Safety ("DCS") removed J.A. from Mother's home after DCS received a report that J.A. was being abused.  DCS placed J.A. with a foster family after determining placement with a relative was not appropriate.

**¶4**         After J.A.'s removal, DCS allowed Father to have video chats with J.A. during Mother's supervised visitation time.  Father was not required to participate in any other services at that time because his paternity had not been established.  In April 2018, Father stopped having the video chats or any other communication with J.A. and discontinued contact with DCS.  Father's paternity of J.A. was confirmed through genetic testing in June 2018.  In the following months, the DCS case manager sent

---

[1]     Mother's parental rights were terminated on November 6, 2018.  She is not a party to this appeal.

[2]     Father has been involved in dependency and severance proceedings in Iowa for his other children, arising out of concerns regarding Father's substance abuse, mental health issues, domestic violence problems, and lack of stable housing or employment.

Father three letters in an attempt to reestablish contact with Father and set up services but received no response.

¶5         The juvenile court found J.A. dependent as to Father and Mother on September 25, 2018, and set the case plan as severance and adoption. In October of 2018, DCS moved to terminate Father's parental rights based on abandonment. *See* A.R.S. § 8-533(B)(1). Father did not contact the DCS case manager until November 2018, at which point Father admitted he had received the letters from DCS but had not thought it was important to participate in services.

¶6         Father had not contacted J.A. at all from April 2018 to November 2018. DCS reestablished video visits between Father and J.A. in January 2019, but those visits stopped in March 2019 when a new DCS case aide was assigned.[3] In February 2019, Father sent J.A. a toy and a letter, but otherwise Father never provided any clothing, supplies, or monetary support for J.A. Father was granted two opportunities to see J.A. in person in April 2019 and May 2019, but he failed to take advantage of either opportunity even though DCS was ordered to pay for and provide round-trip transportation for Father from Iowa to Arizona.

¶7         The juvenile court held the contested severance hearing as to Father on May 2 and 20, 2019. The judge granted Father's motion to appear telephonically on the first day of the hearing, even though Father had been ordered to appear in person. Father failed to appear either in person or by phone on the second day of the hearing.[4]

¶8         At the time of the severance hearing, Father had not seen J.A. in person since 2016. The DCS case manager testified that J.A. calls Father by his first name—Troy—and that the two do not seem to have a strong parental bond. After considering the evidence presented, the juvenile court terminated Father's parental rights, finding: first, that Father had abandoned J.A. by failing to maintain a normal parental relationship or provide reasonable support to J.A., and second, that termination would be

---

[3]     Father claims the visits stopped because he was having difficulty contacting the new case aide. The case aide told a supervisor that there had never been any communications from Father.

[4]     Although the juvenile court chose not to treat Father's failure to appear as an admission of the allegations presented, it did consider the failure to appear as demonstrating Father's "disinterest" in the proceedings.

in J.A.'s best interest because J.A. was in a prospective adoptive placement that was meeting all of his needs.

**¶9** Father filed a timely notice of appeal. We have jurisdiction pursuant to A.R.S. § 8-235(A) and Rule 103(A) of the Arizona Rules of Procedure for the Juvenile Court.

## ANALYSIS

### I. Standard of Review

**¶10** "Parents possess a fundamental liberty interest in the care, custody, and management of their children." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24 (2005). A court may sever parental rights if it finds clear and convincing evidence of one of the statutory grounds for severance and finds by a preponderance of the evidence that severance is in the child's best interest. *See* A.R.S. §§ 8-533(B), -537(B); *Kent K.*, 210 Ariz. at 281-82, 288, ¶¶ 7, 41.

**¶11** As the trier of fact, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (quoting *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004)). We review the juvenile court's order severing a parent's rights for an abuse of discretion, and we will not disturb the court's order unless no reasonable evidence supports its factual findings. *E.R. v. Ariz. Dep't of Child Safety*, 237 Ariz. 56, 58, ¶ 9 (App. 2015); *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

### II. Termination Pursuant to A.R.S. § 8-533(B)(1)

**¶12** Father argues insufficient evidence supports the juvenile court's termination of his parental rights under A.R.S. § 8-533(B)(1) because his involvement with J.A. was more than minimal and because DCS failed to take appropriate steps to facilitate a relationship between Father and J.A. *See* A.R.S. § 8-531(1).

**¶13** The juvenile court may terminate parental rights under A.R.S. § 8-533(B)(1) if "the parent has abandoned the child," with "abandonment" meaning

> [T]he failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial

finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

A.R.S. § 8-531(1). This court measures abandonment "not by a parent's subjective intent, but by the parent's conduct." *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 18 (2000). When circumstances prevent a parent "from exercising traditional methods of bonding with his child, [the parent] must act persistently to establish the relationship however possible." *Pima Cty. Juv. Action No. S-114487*, 179 Ariz. 86, 97 (1994). Furthermore, "[t]he burden to act as a parent rests with the parent, who should assert his legal rights at the first and every opportunity." *Michael J.*, 196 Ariz. at 251, ¶ 25.

¶14 Here, reasonable evidence supports the juvenile court's finding that Father had abandoned J.A. Prior to DCS' involvement, Father never established paternity of J.A., never contributed any child support to J.A.'s care, did not participate with Mother in any parental decision-making concerning the child, and never sought parenting time or custody of J.A. Although Father was participating in video calls with J.A., Father only met J.A. twice, at most, in the child's life.

¶15 Even after DCS became involved, Father admitted he did not think it was important to participate in services with DCS and went from April 2018 to November 2018—a period of longer than six months— without contacting J.A. at all. Father did not take necessary steps to rebut the legal presumption of abandonment and, although Father argues DCS failed to facilitate a relationship between himself and J.A., ultimately it was Father's burden to "act persistently to establish the relationship however possible." *See No. S-114487*, 179 Ariz. at 97. Father sent a letter and toy to J.A. in February 2019 but has otherwise failed to provide any support for the child. In addition, J.A. does not recognize Father as a father, and instead refers to Father by his first name. On this record, the juvenile court did not abuse its discretion in finding Father had abandoned J.A. based on Father's failure to make more than minimal efforts to support or communicate with J.A. and failure to maintain a normal parental relationship with J.A. for more than six months.

*III.    Best Interest of the Child*

**¶16**         Father also asserts that insufficient evidence supports the juvenile court's finding that termination would be in J.A.'s best interest. Father argues he had no negative interactions with J.A. during their video visits, kept in contact with J.A., and attended multiple court proceedings regarding J.A.

**¶17**         In terminating a parent-child relationship based on abandonment, the juvenile court must consider the best interest of the child. A.R.S. § 8-533(B).  In doing so, the juvenile court must balance the parent's interest in the care and custody of the child "against the independent and often adverse interests of the child in a safe and stable home life." *Kent K.*, 210 Ariz. at 286, ¶ 35.  The best-interest inquiry must also "include a finding as to how the child would benefit from a severance *or* be harmed by continuation of the [parent-child] relationship." *Maricopa Cty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990).

**¶18**         Although Father has not had any negative interactions with J.A., Father does not dispute that J.A. is in an adoptive placement that is meeting all of the child's needs.  The juvenile court found J.A. was living in a placement willing to adopt J.A. and to provide care into the indefinite future, which placement J.A. had resided in since removal from Mother in 2018.  The juvenile court also found J.A. would suffer a detriment if Father's rights were not terminated because J.A. "would be forced to linger in foster care unnecessarily without permanency."  Accordingly, reasonable evidence supports the juvenile court's finding that termination of Father's parental rights was in J.A.'s best interest.

**CONCLUSION**

**¶19**         For the foregoing reasons, we affirm the juvenile court's order terminating Father's parental rights to J.A.

